# UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

| | |
|---|---|
| RICHARD G. KOSSWIG, ET AL., | : |
| Plaintiffs, | : |
| | : |
| v. | :      Civil No. 3:06cv499 (PCD) |
| | : |
| THE TIMKEN COMPANY and | : |
| TIMKEN U.S. CORPORATION, | : |
| Defendants. | : |

## RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

Plaintiffs[1] originally brought suit against Defendants in Connecticut Superior Court in

February 2005, alleging five state law claims, including breach of contract, promissory estoppel,

negligent misrepresentation, and a statutory wage claim. (Pls.' Mem. Opp'n 2.) Defendants

moved to strike all state claims on the ground that they were preempted by the Employee

Retirement Income Security Act ("ERISA"). The Connecticut Superior Court granted

Defendants' motion in March 2006. (Defs.' Notice of Removal ¶ 1.) On March 8, 2006,

Plaintiffs filed a Request For Leave to Amend Complaint along with a Substituted and Amended

Complaint alleging an ERISA claim.[2] (Id.) Count Six of Plaintiffs' Amended Complaint is

brought under § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), seeking "to enforce rights

under the terms of a severance plan and to recover benefits due to participants/beneficiaries

under the terms of the severance plan." (Am. Compl., Count Six ¶ 1.) The case was removed to

---

[1]     In addition to the named plaintiff, Richard G. Kosswig, the other plaintiffs are: Craig D. Betancourt, Michael E. Doyle, Cindy Cerrigione, John D. Leffingwell, Gene J. Hubbard, Chris Fabbo, Anita L. Marciano, Brady L. Walker, Michael R. Hand, Susan Tonetti, Michael J. Biondo, Joseph P. Muscatello, Fred Pasler, Michael J. Maccalous, Imad Raza, Kathlreen Wilk, Hue Huynh, Barry A. Murphy, David Stewart, Jay W. Phoenix, Dorothy E. LaManna, Robert Thompson, John J. O'Connor, Nick Damore, Scott A. Woodilla, Tami A. Sojo, and Frederick Gyurickso. (Am. Compl., Count Six ¶¶ 7-34.)

[2]     In their Amended Complaint, Plaintiffs preserved Counts One, Two, Three, and Five—which contained state law claims of breach of contract, promissory estoppel, negligent misrepresentation, and violations of Conn. Gen. Stat. §§ 31-72 and 31-76k—for purposes of appellate review. (See Am. Compl., Counts One, Two, Three, Five.)

this Court on April 3, 2006. Defendants subsequently moved, pursuant to Rule 12(c) of the

Federal Rules of Civil Procedure, for judgment on the pleadings on Plaintiffs' ERISA claim.

This Court denied Defendants' motion on February 27, 2007. Following discovery, Plaintiffs and

Defendants filed cross-motions for summary judgment, each claiming they are entitled to

judgment in their favor based on different versions of a severance policy. For the reasons stated

herein, Defendants' Motion for Summary Judgment [Doc. No. 43] is **granted** and Plaintiffs'

Motion for Summary Judgment [Doc. No. 41] is **denied**.

## I.  BACKGROUND

The facts of this case are almost entirely disputed, however, the Court has found the

following facts as relevant for the resolution of the present matter. Disagreements between the

parties are noted.

Plaintiffs were employed by Ingersoll-Rand ("I-R") at its Torrington, Connecticut facility

until October 16, 2002. (Kosswig Aff. ¶ 2, Mar. 30, 2007, Ex. 1 to Pls.' Mot. Summ. J.) At that

time, I-R completed a Stock and Asset Purchase Agreement ("Purchase Agreement") with the

Timken Company, affiliated with the Timken U.S. Corporation (together "Timken"), pursuant to

which I-R sold the Torrington facility to Timken. (I-R/Timken Purchase Agr. 1, Oct. 16, 2002,

Ex. 4 to Pls.' Mot. Summ. J.) As part of the sale, Timken hired a number of I-R employees,

including all Plaintiffs. (Kosswig. Aff. ¶ 6.) On December 22, 2003, Timken and RBC Aircraft

Products, Inc. ("RBC") concluded a written asset purchase agreement pursuant to which Timken

sold the Torrington facility to RBC. (Timken/RBC Purchase Agr. 1, Dec. 22, 2003, Ex. 6 to Pls.'

Mot. Summ. J.) As with the I-R/Timken transaction, some Timken employees were hired by

RBC, again including all Plaintiffs. (Kosswig Aff. ¶ 13.) Defendants assert that Plaintiffs

accepted jobs at RBC with equal, if not higher, pay, and that the jobs did not require relocation.

(Defs.' Local Rule 56(a)(1) Statement ¶ 11.) Plaintiffs maintain the jobs were not equivalent because, as discussed in more detail below, RBC's benefits were less favorable than those offered at Timken. (Kosswig Aff. ¶ 13.)

Shortly before the Timken-RBC transaction, several Plaintiffs believed they were going to be terminated by Timken as a result of the sale of the Torrington facility. In anticipation of termination, Plaintiff Anita Marciano sent an email to a Timken human resources officer inquiring as to the severance policy applicable to Plaintiffs. (Marciano Aff. ¶ 4, Apr. 17, 2007, Ex. 10 to Pls. Mot. Summ. J.) That email was not answered. (Id.) Following the Timken/RBC transaction, Plaintiffs gathered together to discuss the possibility of receiving severance benefits, believing that their employment had been terminated by Timken when RBC became their employer. (Kosswig Aff. ¶ 11; Marciano Aff. ¶¶ 5-6.) At this meeting it was decided, as preparation for a lawsuit, that Marciano would again try and locate the Timken severance policy. (Kosswig Aff. ¶ 17; Marciano Aff. ¶ 6.) Marciano first conducted an internet search and, finding nothing, sent a second email to a Timken human resources officer. (Marciano Aff. ¶¶ 7-8; Marciano-Pagano Email, Feb. 18, 2004, Ex. 7 to Pls.' Mot. Summ. J.) In this email, Marciano requested a copy of the severance policy to help "a collegues [sic] who is trying to develop [a severance] policy and has asked some of us for our Severance Policies." (Marciano-Pagano Email.) Pagano wrote in reply that "I don't have the 'Timken' policy - all I have is what we have been using prior to the acquisition and now through-out the integration. Still awaiting the 2004 Timken policy as it is being re-designed for implementation for the whole company." (Marciano-Pagano Email.) The source of contention, and confusion, is that Pagano's reply included information identical to that found in Schedule 5.8(g)(i). (Id.)

Before filing this action, Plaintiffs did not inquire as to their eligibility for severance benefits, formally file claims for severance benefits, or exhaust any internal plan remedies because, they claim, they were never informed by Timken of any eligibility requirements different from the ones they had always believed existed at I-R, a belief confirmed by the Purchase Agreement, Schedule 5.8(g)(i), and the email from Timken's human resource officer Toni Pagano. (See Pls.' Mem. Opp'n 7; Rankine Aff. ¶ 10, Mar. 29, 2007, Ex. D to Defs.' Mot. Summ. J; Biondo Depo. 21:18-24, Oct. 20, 2005, Ex. F to Defs.' Mot. Summ. J.; Cerrigione Depo. 41:4-42-25, Oct. 19, 2005, Ex. F to Defs.' Mot. Summ. J.)

## II.    STANDARD OF REVIEW

Summary judgment may be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). An issue of fact is "genuine" if it provides a basis for "a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). Material facts are determined by the substantive law governing the case and therefore "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. In order to determine whether

summary judgment is appropriate, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. <u>Matsushita</u>, 475 U.S. at 587. "Only when reasonably minds could not differ as to the import of the evidence is summary judgment proper." <u>Bryant v. Maffucci</u>, 923 F.2d 979, 982 (2d Cir. 1991). If the non-moving party has submitted evidence that is "merely colorable," however, summary judgement may be granted. <u>Anderson</u>, 477 U.S. at 249. The mere existence of some alleged factual disputes will not defeat an otherwise properly supported motion for summary judgment. <u>Id</u>. at 247. These same standards apply where, as here, the parties filed cross-motions for summary judgment. <u>Morales v. Quintel Entm't, Inc.</u>, 249 F.3d 115, 121 (2d Cir. 2001). In the Second Circuit, courts have followed the proposition that the standards for granting summary judgment "apply to ERISA actions to the same extent they do to other civil actions . . . ." <u>Ludwig v. NYNEX Serv. Co.</u>, 838 F. Supp. 769, 780 (S.D.N.Y. 1993) (citing <u>Rodriguez-Abreu v. The Chase Manhattan Bank, N.A.</u>, 986 F.2d 580, 583 (1st Cir.1993)); <u>see also</u> <u>Rizk v. Long Term Disability Plan of Dun & Bradstreet Corp.</u>, 862 F. Supp. 783, 791 (E.D.N.Y. 1994).[3]

## III.    DISCUSSION

ERISA is a comprehensive statute reflecting numerous Congressional goals, one of which was that "ERISA preempt[] any state law claims that [a] plaintiff may have because the

---

[3]    When a plaintiff claims a denial of severance benefits under ERISA, federal courts, after examining the benefits policy, adopt one of two standards of review to judge a defendant's actions: arbitrary and capricious or *de novo*. The United States Supreme Court has held that "a denial of benefits challenged under § 1132(a)(1)(B) of ERISA is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L. Ed. 2d. 80 (1989). Where an employer was vested with discretionary authority, its decisions should be viewed under the more deferential arbitrary and capricious standard. <u>Id</u>. at 114-15. The Court need not conduct such an examination in this case, however, because Defendants did not deny any claim for benefits since Plaintiffs failed to ever apply for them. As such, the normal standard of review for summary judgment under Rule 56(c) will apply.

state law claims directly 'relate to' employee benefit plans."[4] Kolasinski v. Cigna Healthplan, Inc., 163 F.3d 148, 149 (2d Cir. 1998) (quoting 29 U.S.C. § 1144(a) (establishing that ERISA's provisions "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan . . . .")); see also Devlin v. Transp. Commc'ns Int'l Union, 173 F.3d 94, 98 (2d Cir. 1999) (Congress intended for exclusive federal regulation of benefit plans under ERISA's preemption clause). As the Supreme Court noted, the "[t]he basic thrust of the pre-emption clause . . . was to avoid a multiplicity of regulation in order to permit the nationally uniform administration of employee benefit plans." New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 656, 115 S. Ct. 1671, 131 L. Ed. 2d. 695 (1995).

The Second Circuit has stated that severance benefit plans serve two purposes: rewarding employees for past services rendered to a company and, more importantly, shielding employees from economic hardships resulting from joblessness. Bradwell v. GAF Corp., 954 F.2d 798, 801 (2d Cir. 1992). To this end, ERISA provides that "a civil action may be brought by a participant or beneficiary to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a).

### A.    Dispute Over Terms of I-R Severance Plan Maintained by Timken

Both parties agree that I-R maintained a severance benefits policy for employees, that as part of the Purchase Agreement Timken agreed to continue this policy until December 31, 2003,

---

[4]    29 U.S.C. § 1002(1)(A) defines "employee benefit welfare plan" as "any plan . . . established or maintained by an employer . . . for the purposes of providing for its participants or their beneficiaries . . . benefits in the event of sickness, accident, disability, death or unemployment."

and that the policy applied to I-R employees hired by Timken.[5] (Kosswig Aff. ¶ 10; I-R/Timken Purchase Agr. 1.) The parties disagree, however, over what document is the governing I-R severance policy. The Court will discuss the evidence and arguments with regard to this issue, however, a decision as to which document is the actual I-R severance plan is not necessary, as Plaintiffs are ineligible for benefits under either plan.

Plaintiffs maintain that Paragraph 5.8(g) and Schedule 5.8(g)(i), as contained in the Purchase Agreement, are the sole terms of the I-R severance plan. (Kosswig Aff. ¶¶ 3-6; Marciano Aff. ¶ 11; I-R/Timken Purchase Agr.; Schedule 5.8(g)(i).) Timken, however, argues that Schedule 5.8(g)(i) is only part of—not the whole—policy. Paragraph 5.8(g)(i) provides that from the conclusion of the purchase until December 31, 2003, Timken would provide severance benefits to I-R employees "in accordance with the severance policy set forth in Schedule 5.8(g)(i) . . . ." (I-R/Timken Purchase Agr. ¶ 5.8(g).) Schedule 5.8(g)(i), titled "Severance Policy," provides simple formulas for calculating severance benefits for different classes of employees terminated for any reason other than for cause. Thus, according to Plaintiffs, when Timken terminated their employment as part of the RBC transaction, Timken need only have calculated their severance benefits under Schedule 5.8(g)(i)'s rubric.

Plaintiffs offer affidavits, depositions, and documentary evidence in support of their contention that Schedule 5.8(g)(i) constitutes the I-R severance policy. Plaintiff Anita Marciano, before being hired by Timken, worked as a Human Resources Specialist at I-R and processed severance payments for terminated workers. (Marciano Aff. ¶¶ 2-3.) She states that the policy she used to process claims while at I-R is identical to the one referenced by, and attached to, the

---

[5]     The Purchase Agreement, under the heading "Continuation of Comparable Benefit Plans," states that Timken agreed to maintain I-R employee benefit policies that "in the aggregate, are substantially comparable to the Company Benefit Plans in effect immediately prior to the Closing." (I-R/Timken Purchase Agr. ¶ 5.8(c).)

Purchase Agreement and contained in an email she received from Toni Pagano, a Timken human resources officer. (Id. at ¶¶ 9-11.) Plaintiffs rely on the Marciano-Pagano email to support their assertion that "plaintiffs made inquiry as to the specific requirements of the Timken severance policy," that "[t]he severance policy disclosed to plaintiffs was **identical to the Timken Severance Clause**," and therefore that their defenses of futility or estoppel are warranted. (Pls.' Mot. Summ. J. 4 (emphasis in original).) To further support their claim, Plaintiffs offer documentation indicating that their understanding of the I-R severance policy, acquired while working at I-R, mirrors the language found in Schedule 5.8(g)(i). (Kosswig Aff. ¶¶ 3-5; Hubbard Depo. 18:3-17, Oct. 21, 2005, Ex. F to Defs.' Mot. Summ. J.; Kosswig Depo. 32:18-33:8, Oct. 21, 2005, Ex. F. to Defs.' Mot. Summ. J.) These documents reveal, however, that no Plaintiff, except Marciano, ever read the I-R severance policy while at I-R or Timken. (Kosswig Aff. ¶¶ 3-5, 15; Hubbard Depo. 16:12-17:25; Kosswig Depo. 32:18-33:15.) Plaintiffs instead rely on recollections and secondhand accounts based on the terminations of fellow employees at I-R. (Kosswig Aff. ¶ 4; Hubbard Depo. 17:19-18:6; Kosswig Depo. 32:18-33:8.)

Defendants argue that the documents Plaintiffs rely on are merely the *formulas* used for calculating benefits. Defendants instead point to a document titled "Severance Policy," which they claim is the actual I-R policy.[6] (Defs.' Severance Policy, Ex. A. to Defs.' Mot. Summ. J.) This three-page document states that it "is the plan document for the Torrington Company

---

[6] As Plaintiffs point out, this document contains blanks sections in the "Coverage and Effective Date" and "Miscellaneous" sections, including what time period the plan covers employees and the plan's "official number." Defendants, however, do not contend that this is the original signed and dated policy. Instead, they argue that it illustrates the whole of the severance policy that Timken agreed to maintain, with Schedule 5.8(g)(i) detailing the methods to be used to calculate benefits. It is not clear why this document was not referenced in, attached to, or otherwise incorporated into the Purchase Agreement between I-R and Timken, whereas Paragraph 5.8(g) of the Agreement explicitly referenced Schedule 5.8(g)(i). It is also worth noting that the document begins on page sixteen, indicating that it may have been part of a larger collection of documents.

Severance Plan for eligible employees" and that it is in compliance with ERISA. (<u>Id</u>.) Under the heading "Eligibility for Benefits," the pertinent language provides that "[a]ll full-time and part-time covered employees of the Company that experience loss of employment *due to sale of business* . . . become eligible for benefits under the terms of this plan on the date of their termination." (<u>Id</u>.) (emphasis added). The plan specifically defines "eligibility" as occurring when "[l]oss of job is due to sale of business and the Torrington Company or purchaser does not offer 'suitable' continued employment. A 'suitable' job is one with at least equal pay and not requiring relocation." (<u>Id</u>.)

Defendants defend the authenticity and controlling nature of this document through the affidavits of Debra Rankine and Toni Pagano. Rankine, at the time Timken's General Manager of Total Rewards, identified Defendants' proffered severance plan as the I-R policy Timken agreed to maintain.[7] Rankine based her "clear understanding" of this fact on having been part of a Timken "due diligence team" evaluating the purchase of I-R's Torrington facility. (Rankine Aff. ¶¶ 4-5.) This required meeting "with various I-R employees in order to fully understand and be able to implement their existing benefit plans." (<u>Id</u>.) Pagano was a Compensation Manager at I-R who, like Plaintiffs, transferred to Timken. (Pagano Aff. ¶ 3, Mar. 29, 2007, Ex. E. to Defs.' Mot. Summ. J.) Pagano handled severance benefits at both companies and also claimed to have a "clear understanding" of the I-R severance plan, which she identified as the document submitted by Defendants.[8] (<u>Id</u>. at ¶¶ 4, 8.) Both state in their affidavits that no Plaintiff was eligible for

---

[7] Rankine's affidavit does not actually identify Exhibit "A" as the I-R severance policy. Instead it states "I have reviewed the I-R severance plan attached as Exhibit __." The Court presumes that she is referring to Exhibit A.

[8] Pagano identified Exhibit "C" as the severance policy in her affidavit, however, Exhibit C is actually a list of Timken employees RBC planned to hire. Again, the Court presumes that Pagano is referring to the document attached as Exhibit A.

severance benefits from Timken under the I-R policy because of their subsequent employment with RBC. (Pagano Aff. ¶¶ 10-11; Rankine Aff. ¶¶ 12-14.)

As discussed below, Plaintiffs are ineligible for severance benefits under either proffered plan and Defendants are entitled to judgment as a matter of law.

### B.     Plaintiffs are Barred From Recovering Under Either Severance Policy

If the Court were to find Defendants' version of the I-R severance plan as controlling, Plaintiffs would not be entitled to recover benefits because they would be ineligible under the express terms of the plan. Similarly, even if the Court found Plaintiffs' Schedule 5.8(g)(i) as the applicable severance plan, Plaintiffs would still be ineligible for benefits under Second Circuit case law barring severance benefits for employees who did not experience actual unemployment because they were rehired by a purchasing firm. Additionally, assuming, *arguendo*, that Plaintiffs were entitled to benefits under either plan, they are nonetheless barred from recovery because they failed to exhaust internal plan remedies as required under ERISA and Plaintiffs lack a futility or estoppel defense to excuse such failure.

The following analysis proceeds on the basis that both submitted plans constitute ERISA employee benefit plans. This action is currently before the Court because the Connecticut trial court found that Plaintiffs' severance benefits claim, based on the language contained in Schedule 5.8(g)(i), concerned an ERISA plan. Kosswig v. Timken Co., No. CV054004072S, 2006 WL 894897, at *4 (Conn. Super. Ct. Mar. 3, 2006). The question of whether the plan submitted by Plaintiffs is actually an ERISA plan is not before this Court.

1.      **Plaintiffs are Ineligible for Severance Benefits Under Either Policy Because They Were Offered and Accepted Equivalent Employment at RBC**

Looking first to Plaintiffs' eligibility under Defendants' proffered I-R policy, this plan provides severance benefits where an employee's "[l]oss of job is due to sale of business and the Torrington Company [Timken] or purchaser [RBC] does not offer 'suitable' continued employment. A 'suitable' job is one with at least equal pay and not requiring relocation."[9] (Defs.' Severance Policy.) In their depositions, various Plaintiffs admit that they held the same or similar jobs after the Timken-RBC transaction, performed the same or similar tasks for RBC and, importantly, worked in the same Torrington facility and were paid the same or more by RBC. (See, e.g., Biondo Depo. 7:4-9:25, 19:2-19; Cerrigione Depo. 9:5-10:2, 11:12-14:16; Hubbard Depo. 9:4-11:6, 48:16-23, 69:1-6; Kosswig Depo. 8:7-19, 14:13-18:24, 69:5-6; Marciano Depo. 12:19-24, 71:19-25, Oct. 20, 2005, Ex. F. to Defs.' Mot. Summ. J.; Wilt Depo. 15:23-17:11, 50:15-22, Oct. 19, 2005, Ex. F. to Defs.' Mot. Summ. J.) Moreover, the depositions indicate that the majority of the Plaintiffs did not miss a single day of work or a single paycheck. (See Biondo Depo. 7:5-11; Hubbard Depo. 48:21-23; Kosswig Depo. 69:5-6; Marciano Depo. 12:19-23.) Thus, under the terms of the I-R severance plan submitted by Defendants, Plaintiffs were ineligible for severance benefits from Timken as a matter of law.[10]

---

[9]      Because Timken assumed the obligation to maintain the policy pursuant to the I-R/Timken sale, it has taken the place of the "Torrington Company" in the policy and the "purchaser" is now RBC.

[10]      In their affidavits, Rankine and Pagano, both of whom claim to have a clear understanding of the I-R severance policy, state that no Plaintiff was eligible for severance benefits from Timken because RBC offered them "suitable continued employment." (See Rankine Aff. ¶¶ 12-14.; Pagano Aff. ¶¶ 10-11.) Defendants also note that no Plaintiff filed for severance benefits or was eligible for them when I-R sold the Torrington facility to Timken because they were offered "suitable jobs" by Timken. Since the Timken-RBC transaction was nearly identical to the I-R/Timken sale, Defendants analogize, Plaintiffs are again ineligible for benefits under the explicit terms of the severance policy. (Rankine Aff. ¶ 6; Pagano Aff. ¶ 5.)

Plaintiffs would also be barred from recovering severance benefits under their version of the I-R severance benefits policy, which provides benefits for salaried workers "if [the] Company terminates employee's employment (other than for cause)" according to formulas depending on the employee's age and whether he or she is retiree eligible. (Schedule 5.8(g)(i).) Circuit courts have held, even in the absence of explicit terms in an employer's severance policy, that employees re-hired by the purchasing firm did not qualify for severance benefits because they were not laid-off or terminated. See, e.g., Blank v. Bethlehem Steel Corp., 926 F.2d 1090, 1093 (11th Cir. 1991) (sale of division of company did not entitle employees to severance benefits since there was continuous employment); Harper v. R.H. Macy & Co., Inc., 920 F.2d 544, 545-6 (8th Cir. 1990) (employees not entitled to benefits after sale of business because, under terms of ERISA plan, employees worked without interruption and were not terminated); Rowe v. Allied Chem. Hourly Employees' Pension Plan, 915 F.2d 266, 269 (6th Cir. 1990) (employees' immediate employment by successor firm did not result in "layoff" entitling them to severance benefits); Lakey v. Remington Arms Co., 874 F.2d 541, 545 (8th Cir. 1989) (employees did not lose day of work and granting severance would result in "windfall"); Holland v. Burlington Indus., Inc, 772 F.2d 1140, 1149 (4th Cir. 1985) (employer could deny benefits because employees remained continuously employed in same jobs despite change in ownership); Sly v. P.R. Mallory & Co., 712 F.2d 1209, 1212 (7th Cir. 1983) (employees could not work for subsequent firm and claim ERISA severance benefits from former employer). The Second Circuit has adopted this rationale and, noting that the purpose of severance benefits is to protect employees from the economic hardships of joblessness, held that "[w]here an employee is kept in his or her job . . . despite a change in ownership . . . that employee cannot accurately be described as 'permanently laid off because of lack of work'" under the employer's plan.

Bradwell, 954 F.2d at 801. The court's policy behind this decision was to prevent "a windfall . . . award [of] severance pay to employees who never changed their jobs and were never out of work." Id. at 801.

Courts that permit former employees to claim severance benefits regardless of being rehired by the purchasing firm have often based their decisions on an interpretation of the specific language in the governing severance policies. See, e.g., Ansett v. Eagle-Pitcher Indus., Inc., 203 F.3d 501, 504-05 (7th Cir. 2000) (employees were "terminated" within terms of severance plan, which did not expressly provide for re-hiring as bar to receiving benefits); Ulmer v. Harsco Corp., 884 F.2d 98, 102-03 (3d Cir. 1989) (employees immediately rehired could claim severance benefits, since court interpreted policy to bar severance only when employer rehired employees in a different division);[11] Harris v. Pullman Standard, Inc., 809 F.2d 1495, 1498 (11th Cir. 1987) (court interpreted severance policy to bar employer from denying severance benefits to former employees because their new jobs were not with the same employer).

Plaintiffs argue that they are eligible for severance benefits because the jobs offered by RBC were "not equivalent" to those at Timken. (Pls.' Local Rule 56(a)(1) Statement ¶¶ 23-27.) Specifically, Plaintiffs claim that RBC eliminated accrued seniority and severance benefits, lowered 401(k) contributions, offered less health insurance coverage at higher premiums, and granted less vacation time. (Kosswig Aff. ¶ 13; Cerrigione Depo. 13:23-14:16.) In Boss v. Advanstar Commc'ns, Inc., 911 F. Supp. 109, 112 (S.D.N.Y 1995), the court, faced with the question whether two positions were "equivalent," held that a plaintiff was not entitled

---

[11]     The Third Circuit's recent holding in Aldinger v. Spectrum Control, Inc., 207 Fed. Appx. 177, 181 (3d Cir. 2006), which denied severance benefits to employees whose jobs continued with subsequent purchaser because of the language of the severance plan, casts some doubt on Ulmer's blanket application. Ulmer was not directly addressed in Aldinger.

to severance benefits where "the nature, terms and conditions of the employment . . . offered by [the purchasing firm], taken as a whole, were reasonably comparable to those of her employment by [the original employer] immediately prior to the sale." Id. The court found this standard satisfied because after the sale the employee held the same position with substantially the same duties and also received a pay raise, improved disability insurance, a pension plan, and equivalent vacation. Id. The position was "reasonably comparable" even though the new job did not provide severance benefits and its insurance and 401(k) benefits were less generous. Id.; see also Jessup v. Alcoa, Inc., 481 F.3d 1004, 1007-08 (8th Cir. 2007) ("when a facility is sold . . . to a new owner, employees who continue to work for the new owner under substantially the same terms and conditions are not entitled to . . . severance benefits."); Joyce v. John Hancock Fin. Servs., Inc., 462 F. Supp. 2d 192, 206 (D. Mass. 2006) (former employee not entitled to severance benefits after accepting position with subsequent firm that offered comparable employment, despite unsupported allegations benefits were not comparable and former employer "tricked" employee into accepting new position); Blessing v. J.P. Morgan Chase & Co., 394 F. Supp. 2d 569, 582-585 (S.D.N.Y. 2005) (employee not entitled to severance benefits from original employer because second employer offered comparable work and benefits).

In light of the facts and Circuit case law, Plaintiffs' claim for severance benefits under Schedule 5.8(g)(i) cannot stand.[12] As previously noted, under the criteria used by the court in Boss v. Advanstar, the positions Plaintiffs accepted at RBC were equivalent, or "reasonably comparable," to those they had at Timken, if not slightly better in terms of salary. 911 F. Supp at

---

[12]     The Fifth Circuit has explicitly held that "[t]he plaintiff has the burden of proving that she is eligible to receive benefits . . . ." Boliver v. Bellsouth Pensions Serv. Ctr., No. 06-60374, 2007 U.S. App. LEXIS 398, at *5 (5th Cir. Jan. 9, 2007) (citing Kirschenheuter v. Bd. of Trs. of the GSC-ILA Pension Plan & Trust, 341 F. Supp. 2d. 624, 628 (S.D. Miss. 2004) (plaintiff bears initial burden of demonstrating entitlement to plan benefits)).

112. The alleged differences in benefits between Timken and RBC were that "[t]he match on the 401(k) was less" (Cerrigione Depo. 13:23-14:16.), the health insurance covered less at higher premiums, RBC offered less vacation time, and RBC eliminated accrued seniority and severance benefits. (Kosswig Aff. ¶ 13.) Despite these differences, the conditions at RBC were reasonably comparable to the terms of employment previously offered by Timken—i.e., same or similar positions, tasks and benefits, same location, and same or higher salary—and therefore, in light of their continued employment at RBC, Plaintiffs should not receive a "windfall" award of severance benefits. Bradwell, 954 F.2d at 801. Therefore, applying the law in this Circuit, Plaintiffs were ineligible for severance benefits from Timken under Schedule 5.8(g)(i) as a matter of law and policy.

> **2.    Plaintiffs Failed to Exhaust Plan Remedies and are not Excused by the Defenses of Futility or Estoppel**

Assuming, *arguendo*, that Plaintiffs were eligible for benefits under either alleged I-R severance policy, Plaintiffs are nonetheless barred from recovering benefits because they failed to meet ERISA's exhaustion requirement and their futility and estoppel defenses are insufficient.

ERISA claims brought pursuant to 29 U.S.C. § 1132(a)(1)(B) are subject to the doctrine of exhaustion, which bars plaintiffs from bringing proceedings in federal court unless they previously utilized all internal plan remedies. The purpose of the exhaustion requirement is to: "(1) uphold Congress' desire that ERISA trustees be responsible for their actions, not the federal courts; (2) provide a sufficiently clear record of administrative action if litigation should ensue; and (3) assure that any judicial review of administrative action (or inaction) is made under the arbitrary and capricious standard, not *de novo*." Kennedy v. Empire Blue Cross & Blue Shield, 989 F.2d 588, 594 (2d. Cir 1993) (quoting Denton v. First Nat'l Bank of Waco, 765 F.2d 1295,

1299 (5th Cir. 1985)). The judicial emphasis on exhaustion of plan remedies stems from a

concern that "[i]f an informal or unsubstantiated denial of a 'claim' that was never filed or

formally presented is reviewable in federal courts, then, in such situations, the courts and not

ERISA trustees will be primarily responsible for deciding claims for benefits." Davenport v.

Harry N. Abrams, Inc., 249 F.3d 130, 134 (2d Cir. 2001) (quoting Barnett v. IBM Corp., 885 F.

Supp. 581, 588 (S.D.N.Y. 1995)).

A futility defense will shield a plaintiff from a failure to exhaust remedies if, and only if,

"claimants make *a clear and positive showing* that pursuing available administrative remedies

would be futile." Kennedy, 989 F.2d at 594 (internal quotation marks and citations omitted)

(emphasis added).[13] Because ignorance of claim procedures does not support a futility defense,

the Second Circuit in Kennedy rejected a defense of futility where there was no evidence that the

plaintiff had even notified those in charge of the plan that he had a claim. Id. Particularly

relevant to the case at bar, the Second Circuit in Davenport agreed with the trial court that

"[e]ven if plaintiff was unaware of her remedies under the plan prior to the institution of this

action, she became aware of them now and yet inexcusably has failed to avail herself of them."

Davenport, 249 F.3d at 134.[14] In Davenport, the plaintiff had never attempted to file a claim for

benefits or requested the plan. Id. The court held that a plaintiff is "required to exhaust [plan

---

[13]  The "clear and positive showing" standard is a high bar. See Barnett, 885 F. supp. at 587 (even if plaintiff's allegation that defendant had told plaintiff that any application for benefits would be denied was true, it was not enough to establish futility); DeLong v. Teacher's Ins. & Annuity Ass'n, No. CIV.A. 99-1384, 2000 WL 426193, at *4 (E.D. Pa. Mar. 29, 2000) (to establish futility, plaintiffs "must show that it is certain that their claim will be denied on appeal, not merely that they doubt an appeal will change the decision.").

[14]  In emphasizing this point, the Second Circuit quoted both the Fifth Circuit in Meza v. General Battery Corp., 908 F.2d 1262, 1280 (5th Cir 1990), which said that even though the former employee had not received a copy of the plan as required by ERISA, "he has not shown that the lack of information has harmed him or precluded him from pursing his administrative remedies *at this point*," and the district court in DeLong, which denied a futility defense because "[i]t would be illogical for [the] plaintiff to be allowed to establish futility based on ignorance of a claims process which he was never close to invoking." 2000 WL 426193 at *5.

16

remedies] even if she was ignorant of the proper claims procedure," stating that "[i]gnorance of a claim procedure does not defeat the exhaustion requirement." Id. at 134, 133 n.2. The court approvingly cited the Fifth Circuit's holding that there is "a duty to seek the necessary information even if it has not been made available." Id. at 133 n.2 (quoting Bourgeois v. Pension Plan, 215 F.3d 475, 480 (5th Cir. 2000)).

Regardless of which version of the plan is accepted as the governing I-R severance policy, there is no genuine issue as to Plaintiffs' failure to meet the exhaustion requirement. According to Debra Rankine, who handled Timken's benefits plans at the time in question, Timken received no request for severance benefits from Plaintiffs. (Rankine Aff. ¶ 10.) Several Plaintiffs have also admitted that they did not alert Timken to any potential severance benefit claims before filing suit. (See Biondo Depo. 21:18-24; Cerrigione Depo. 42:14-21; Hubbard Depo. 46:1-4; Wilt Depo. 53: 13-22.) Plaintiffs' argument against failure to exhaust stems entirely from the Marciano-Pagano email, which Plaintiffs use to support their assertion that "plaintiffs made inquiry as to the specific requirements of the Timken severance policy."[15] (Pls.' Mot. Summ. J. 4.) In her email to Timken human resources officer Toni Pagano, however, Marciano actually requested the severance policy simply to help "a collegues [sic] who is trying to develop [a severance] policy and has asked some of us for our Severance Policies." (Marciano-Pagano Email.) She did not state that she was requesting the policy in order to submit a claim. Marciano's email is not sufficient to demonstrate an attempt to file a claim for benefits

---

[15]     Elsewhere, Plaintiffs argue that "plaintiffs *did* inquire of Timken as to the requirements of any severance plan for their benefit." (Pls.' Mem. Opp'n 10.) (emphasis in original) They further allege that "[p]laintiffs conducted a diligent search for a written copy" of the I-R severance plan through "repeated inquiries with Timken, an internet search and an inquiry to [I-R]." (Id. at 10 n.8.) In support of this assertion Plaintiffs cite only to Marciano's affidavit, which Defendants allege is misleading because the inquiry did not ask for the severance policy in connection with a claim for benefits. Although Plaintiffs claim there were "repeated inquires," the record contains only Marciano's second email to Pagano.

or request the plan, as Marciano failed to reference a potential claim or the actual reason she needed the policy.

To defend their failure to exhaust, Plaintiffs first raise a futility defense. Specifically, they argue that it would have been futile for them to make a severance demand or claim under Schedule 5.8(g)(i)—which they believed and still maintain is the actual I-R policy—because it contained no claims or appeals procedures and indicated no trustee or plan administrator. (Kosswig Aff. ¶ 16.) Only after Plaintiffs had filed legal action did Timken produce their version of I-R's severance benefits policy, which contained the procedures and plan information mandated by ERISA.[16] (Kosswig Aff. ¶¶ 16-17.) Under either ERISA plan, however, Plaintiffs' futility defense fails in light of the facts of the case, which reveal a complete absence of any genuine attempt to apply for severance benefits or alert Timken to their desire to apply for benefits before filing suit. Ignorance of a claim procedure does not support finding a futility defense. Kennedy, 989 F.2d at 594. Even if an employee was unaware of plan remedies prior to filing suit, once he or she learns of them during the course of litigation it is "inexcusable" for the employee not to avail him- or her- self of the remedies. Davenport, 249 F.3d at 134.[17] This is true even if Plaintiffs were operating under the impression that Schedule 5.8(g)(i)—lacking ERISA requirements, such as having a claim procedure—was the I-R plan. Plaintiffs should have contacted someone at Timken and explicitly inquired as to their eligibility and the proper claims

---

[16]    See 29 U.S.C. § 1102 (requiring that every employee benefit plan be established or maintained pursuant to a written instrument and that the instrument provide for named fiduciaries, sources and methods of funding, procedures to, and persons who can, amend the plan, and a basis on which payments are made); 29 C.F.R. 2560.503-1(b) (employee benefit plans must have "reasonable procedures" for filing claims and appeals); Birmingham v. SoGen-Swiss Intern. Corp. Ret. Plan, 718 F.2d 515, 522 (2d Cir. 1983) ("A valid plan under ERISA must designate 'a named fiduciary' so that responsibility for managing and operating the Plan - and liability for mismanagement - are focused with a degree of certainty.").

[17]    ERISA permits civil suits by employees seeking "to clarify . . . rights to future benefits under the terms of the plan. 29 U.S.C. § 1132(a)(1)(B).

procedure for requesting severance benefits rather than proceeding on assumptions, as an employee ignorant of a claims procedure is still required to seek out such information through inquiries to their employer before proceeding to federal court. Davenport, 249 F.3d at 133 n.2 & 134. As such, there is no basis for Plaintiffs to make a "clear and positive showing" that plan remedies, such as an appeal, would have futile. Kennedy, 989 F.2d at 594.

Plaintiffs' next argument is that Defendants are estopped from relying on the exhaustion requirement to bar them from recovering severance benefits. A party claiming equitable estoppel "must have relied on its adversary's conduct in such a manner as to change his position for the worse, and that reliance must have been reasonable in that the party claiming estoppel did not know nor should it have known that its adversary's conduct was misleading." Paese v. Hartford Life Accident Ins. Co., 449 F.3d 435, 447 (2d Cir. 2006). Normally, ERISA preempts state and common law claims. The Second Circuit has recognized, however, that "principles of estoppel can apply in ERISA cases under extraordinary circumstances." Schonholz v. Long Island Jewish Med. Ctr., 87 F.3d 72, 78 (2d Cir. 1996) (citing Lee v. Burkhart, 991 F.2d 1004, 1009 (2d Cir.1993)). Although the Second Circuit has not enunciated what facts are required for "extraordinary circumstances," it has noted that "the remarkable consideration in Schonholz was the defendants' use of promised severance benefits as an inducement to persuade [the plaintiff] to retire." Devlin, 173 F.3d at 102.

In the case at bar, it is not necessary to determine what conduct might satisfy the "extraordinary circumstances" requirement for estoppel to apply in an ERISA claim because Plaintiffs fail to meet the standard requirements of estoppel in two respects: they have not shown any conduct upon which they could have reasonably relied nor have they shown any worsening of position. First, Plaintiffs cite in their motion the email from Pagano to Marciano as conduct

19

upon which they reasonably relied in not applying for benefits because there appeared to be no process with which to do so. (Pls.' Mem. Opp'n 10.) Reliance on this email was not reasonable. As discussed, the actual email reveals that Marciano requested an example of a severance policy to give to a colleague; she did not request the terms of the I-R severance policy to apply for benefits.[18] (Marciano-Pagano Email.) Additionally, the email fails to meet the requirement of misleading conduct, since Pagano explicitly stated that she did not have the Timken policy. (Id.) Second, even if Plaintiffs reasonably relied on the Pagano email in not applying for benefits, the depositions indicate that Plaintiffs accepted the positions offered by RBC, positions requiring no relocation and sometimes offering higher compensation, and thus there was no change in position for the worse.[19] While Plaintiffs argue that their new positions at RBC were not equivalent to those at Timken, it has already been determined that the RBC jobs are either "suitable" under Defendants' version of the I-R plan or "reasonably comparable" under existing case law.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment [Doc. No. 43] is **granted** and Plaintiffs' Motion for Summary Judgment [Doc. No. 41] is **denied**. The clerk shall enter judgment in Defendants' favor and close the case.

SO ORDERED.

---

[18]    Since Defendants' Severance Plan is confidential, it is unlikely that it would be disclosed for the reason represented in Marciano's email.

[19]    Assuming that Defendants' document is the applicable I-R plan, if Plaintiffs had applied for benefits they would have found that they were expressly ineligible for benefits because of the "suitable continued employment" offered by RBC. This is thus not a case where employees accepted employment with the purchasing firm, relying on an employer's conduct or assertions indicating that the employees were ineligible for benefits, when, in actuality, the employees were eligible.

Dated at New Haven, Connecticut, August  7 , 2007.

_____
/s/
Peter C. Dorsey, U.S. District Judge
United States District Court